All right. Mr. Kennard for Mr. Ruzicka? Yes, your honor. Before we begin with the appeal arguments, we have received the motion for limited remand for compassionate appeal, a passionate release before the district court and the court is going to take that under advisement. We're going to proceed with the arguments today and we will take your motion under advisement unless of course your desire is to modify the motion and dismiss the appeal. Otherwise, we will continue since all the briefings in the arguments prepared. I think it would be efficient to go ahead and proceed at this point with the appeal unless of course it's your desire to dismiss it. Your honor, thank you for clearing this up at the beginning. I have consulted with my client. We are not dismissing this even cognizant of the fact that each day COVID is running wild through the prison camp in Duluth and so we are prepared to proceed at the court's schedule this morning and with respect to the schedule of all of you setting this up. All right. Okay, then please proceed with your argument. Well, good morning if it pleases the court. My name is John Conard. I represent Jerry Resichka and I have represented him since the beginning of this. This case presents a unique situation where the president of a company was convicted for concealing a series of transactions allegedly from the CEO of the company where those transactions were reported in every audited financial. The ESOP report as officer compensation in the tax forms were fully disclosed within the tax department, disclosed on forms that were prepared specifically for Bill Austin and were disclosed to the tax partner at Mcgladrey Pullen whose sole job it was was to be Bill Austin's personal tax partner. So they were in a fiduciary relationship and so it's a unique situation that includes disclosure of the transactions to the agent of Bill Austin that formed the basis of a series of transactions that were produced in repeated and massive misconduct related to key parts of their theory. Every misstatement that they elicited and every false impression that they created was directed specifically at a piece of evidence that showed that Bill Austin was well aware of these transactions that they were not concealed from him and so they struck right at the heart of the conviction. I'd like to begin with the NAPU and Brady Giglio issues and suggest the court that what's at issue here is do we have a situation where the United States government can obtain a conviction so long as it has only a little perjury in it? Is it the case that the government can engage in only a little bit of concealment? Counsel, this is Judge Loken, would you please clarify the standard of review since your briefs are full of a discussion of inconsistent testimony that the trial court found was not a NAPU violation? Your Honor, with respect, there's a couple of different standards of review. If it's an interpretation of fact, it's obviously an abusive discretion standard. If it's an issue of law, it's de novo. That's just boilerplate. Come on, that doesn't decide cases. Yes, your Honor. Can I be specific about one example I have in mind? I want to know about primarily Austin and Nelson inconsistencies. Well, which particular inconsistency? The issue is whether Austin presented false testimony on direct examination as elicited by the government. The trial court made a ruling, depending on which you're speaking of, that either it was not known to the government that it was false or there was insufficient evidence of that or that it was, and that would be a legal determination, or that it was not... Wait, wait, wait, wait. Not known to the government is an illegal determination? Is a factual determination. What's your Supreme Court authority for that? Or a circuit? Your Honor, I don't know if the connection is coming through or not. I thought I said the determination of whether a piece of testimony is known to be false to the government is a factual determination. Okay. I thought you said the opposite. Now that's consistent with my understanding. Well, I would have been wrong if I said the opposite, and I apologize if I did. It's clarified. Thank you, your Honor. So, however, when both witnesses have presented testimony, that doesn't absolve the government from having to decide and having to correct false testimony. If we go all the way back to NAPU, in that case, that precise argument was raised by the government and rejected by the Supreme Court. They said, well, look, on cross-examination, you got countervailing evidence. And so it was sort of all before the jury and they were free to decide. There's a specific footnote in there. And so the idea that the government can introduce and not correct false testimony, so long as there's some countervailing evidence in the record, I think simply runs counter to NAPU. And I don't think Foster... Well, I think your argument is squarely contrary to cases like West and Hilliard, Eighth Circuit cases. Well, Foster's in Eighth Circuit... Inconsistent testimony creates a jury issue unless the government affirmatively knows what's the truth. Exactly. Well, some of the sworn testimony from Chief Case Agent Kinney in a search warrant affidavit. So Bill Austin says, I never said X to a government agent. The government agent has filed a report saying Bill Austin said X. Counselor, can we just stick to what I'm concerned about here? You said the government has an affirmative duty to correct when Austin and Nelson present inconsistent testimony that the government, that the trial court found the government didn't know, which was false. And I say that's contrary to Eighth Circuit authority and to NAPU as I read it, or not in... I don't think NAPU went there. So keep going with that issue because I think it's very important. Yes, your honor. Well, there's a few differences here. One is the court found a NAPU violation and instructed the government to undertake a search through all of its files and identify and correct everything else. Secondly, I'm sorry... Which specific statements do you allege were actual perjury statements that the government was aware of? Is it possible that the district court found NAPU violations when they really weren't? So if you would point out the specific statements that were perjurious. Well, there are several. The two that the court found and required them to correct was Austin's claim that he had never shredded a document in his life when the testimony of his security agent was that there was two shred boxes, one at each end of his desk. And Agent Kinney had said in sworn testimony that Austin claimed he immediately shredded the descending gross reports upon receiving them. That was deeply critical testimony. Secondly, on the issue of the file formation of an incentive contract, which Austin was essentially trying to get out of by obtaining this conviction, he gave testimony about the timing of that, which Special Agent Snell testified could not possibly have been true. Based on evidence the government had in its possession all the time, that being communications and drafting records from Whitler Mendelsohn and others that Agent Snell, upon review, agreed that Austin's testimony could not possibly be true. But the third example is the testimony of Agent Korpala about SoundPoint. Her testimony was blatantly false. The government had filed a memo at the beginning of the case taking a position that was the opposite of the testimony, so they knew it was false. And it was testimony of the government on its own admission admitted to show Resichka as an example of Resichka enriching himself. So in that case, the court found correctly the fact that it was known to the government, it was done in bad faith, nobody could have possibly believed it was true, they elicited after I objected, and the court inquired and they assured him they had a basis that they didn't have, and the court only the trial by making the determination that that false testimony went solely to the tax count of which Mr. Resichka was convicted. But that testimony was about the acquisition of a dealership through the Northland structure. It was expressed by the government on their own notes in order to show an example of Resichka unjustly enriching himself, consistent with their theory of I understand he was not part of this case, and so he may be coming in late, but the idea that there was some simple mistake. Is Corpella's testimony not being true? Is that the same as it being perjurious? What's the proof that there was intent to deceive or an intent to express a falsehood? Yes, your honor. So in the initial briefing pre-trial, the U.S. government described the very deal as consistent with what I said it was and absolutely inconsistent with the testimony arranged. When I objected specifically with the problem with the testimony, the U.S. attorney at the bench assured Judge Thunheim she had a basis for it that she did not have, and the testimony itself was blatantly false. The trial ruled that nobody could have believed it was true, including two lawyers from Dorsey and Whitney before they joined the U.S. attorney's office. Thirdly, Corpella's behavior on cross-examination where she obfuscated and pretended not to know basic fundamental terms of business law and the government's own claim. Also, I don't think she's the only IRS agent or examiner that's guilty of not understanding the business world. Well, Judge Loken, I have to tell you, Agent Corpella has a lengthy reputation in this district. She's not a spring chicken. What's the remedy for this in your view? The remedy is a new trial. They specifically misdirected the court in order to elicit testimony they knew was false, including that no one could have believed was true, even if I grant that Agent Corpella didn't know, which I don't grant because the issue, Your Honor, is a deal to buy a business, and she described it as a deal to buy solely the accounts payable. There's just no way to make that mistake, but the lawyers eliciting the testimony and the lawyers who prepared the testimony certainly know. These are three white color prosecutors in the biggest case of their career after 18 months and thousands of hours of preparation, and they told the court the deal was something else before they changed it to try to make an easy and cheap example of Resichka committing a fraud. They said that he sold, that he made Starkey pay him $800,000 for $500,000 worth of stuff, and it was utterly false, and then they tried to protect it on cross-examination and almost buried the indictment, according to the district court. To believe that that was an honest... I'm sorry, Your Honor. Counsel, which one of the counts was Corpella's testimony relevant to or and admitted in relation to? There was no... The jury was never instructed on a restrictive admission, Your Honor. I know that the district court determined without argument from either side that it had been admitted solely for tax purposes, but if you read the testimony, there's no restriction there. The government itself has said at APP 137 that the very purpose of the testimony was to show another example of Resichka enriching himself, which was their theory for the case at whole, so it was admitted to make Resichka look like a fraudster for the purpose of character evidence that would go to the entire indictment. I don't think there's any basis to believe it was restricted just to tax counts based on how it came in and how it was experienced when the testimony was delivered. The other examples we list, Your Honor, are... So another example that we had listed is Austin saying, I never said X, Y, Z, the church and state comment to Corpella, and this is why I'm hoping this court will jump in on this. In that report, that was in quotations from the witness. The attorneys from the U.S. Attorney's Office responded by saying, well, geez, we don't know what that means. That could have been an idiom or it could have been a direct quote of testimony. The lawyer who wrote that motion was physically present in that interview, which means that that argument encourages the tribunal to take one of two mutually exclusive interpretations of evidence known to that lawyer, one of which must be false. I mean, this is kind of what's happening when the attorneys from the U.S. Attorney's Office in this case is saying, we don't really know what's going on. We just throw testimony up on the stand, and if some of it happens to be false, well, I hope that the accused citizen has really good lawyers. That is not the standard of due process, and it's not the standard of NAPU. And it makes... I was a prosecutor once, too. It makes a mockery of the Ministry of Justice. Now wait a minute, Counselor, you just threw out the two key words, due process. What case holds this due process for the government to introduce inconsistent testimony when it doesn't know which of the two is true? Your Honor, NAPU says it fails due process for the government to introduce evidence they know is untrue. That doesn't address this who on the stand testify inconsistently, and rather than present this on appeal or to the trial court as sufficiency of the evidence, you present it as a due process, prosecutor misconduct, new trial demanded issue, and I want to know what case supports that. It's law of this case, Your Honor, because once a NAPU violation was found, and by the way, we're not talking... I'm not talking... The district court remedied the NAPU violations. It found you can argue the remedy, and you do argue the remedy was inadequate, but that's not a due process issue. The court ordered the government to find all other issues of false testimony and correct them. That was part of the remedy, and so that became law of this case. Your Honor, if you're asking me, does simple inconsistency raise a NAPU issue? Of course not, but in this case, the only thing that happened in response to the court's order was the government made a self-serving assertion that I guess that it had looked everywhere and found nothing. They didn't correct corpora, and they didn't correct a lot of other things, and so we're now faced with an incomplete record on that based on we have no idea what the government did to suss that out. I think in this case, there was an obligation because the court told them there was. I will move on to another topic. I don't know if we're done with NAPU. Yes, you can move ahead. Thank you, Your Honor. I wanted to talk about the concealment of an entire meeting with key testifying witness, Scott Nelson. His testimony is the sole testimony upon which the district court sustained the conviction. Just so the court understands, we filed Brady motions early in the case, and the U.S. Attorney's Office told the magistrate, other than Jenks, we are pursuing open files discovery. We are not concealing anything. They repeated that assurance to the trial court. We then reached a stipulation with them to get all of the Jenks, which is reflected on Trial Transcript 680, and then almost immediately, they started slow playing Jenks material for Scott Nelson. At District Court Docket 318, the court brushed them back for the late disclosure of Scott Nelson material and had them change their witness order in sanction to it. Then at Trial Transcript 360, halfway through the trial, I asked and then the court inquired directly of the U.S. Attorney, do we have all the materials about Scott Nelson? And the U.S. Attorney said there are some additional disclosures, but we'll get them out today. That entire time, they had a complete meeting with Mr. Nelson designed to induce cooperation, where they showed him extremely embarrassing evidence they would present against him at trial in an effort to induce his cooperation, and they hid all of that. I filed a motion post-verdict a year after the trial, and they confirmed everything in my affidavit except Scott Nelson felt threatened, is what I claimed. Their response to that was we don't think it was a threat. But we then knew that they had completely concealed this meeting. Once again, they assured the District Court, trust us, we know our obligations, we've examined our files, and there's nothing even arguably Brady in it. That's what they told the trial court on the fifth occasion. I filed for the first time in my career a motion to reconsider in federal court. Then and only then did they say, by the way, there's a 302 report, which is a statement by Agent Kinney about what he observed in this investigation that we haven't disclosed. They turned it all over in camera, and the District Court found that it had been obviously Giglio all along. There's no dispute that it was obviously Giglio all along. It was also Jenks material. The District Court's mistake, I think, in ruling on this was the District Court ruled that we knew about the affair, which was the threatened testimony. That's true, we knew about that. What we did not know and what the government concealed from us all along, we didn't know this meeting even happened. We did not know that in a meeting to induce cooperation, the government showed this witness slides of highly embarrassing testimony they would introduce against him at trial. That was still obtaining during trial, during a haranguing redirect by the AUSA that the court has found resolved in uncredible testimony. They hid the fact that they had a deal with him. Mr. Kennard, you have less than a minute remaining if you rebuttal. If you'd like to proceed, you can, or you could reserve what you have left. I'll, with 30 seconds left, I suppose I'll go to rebuttal, your honor. Oh, at the appropriate time. All right. Thank you, Mr. Kennard. Thank you, Mr. Gingrich. Thank you, Chief Judd Smith. Good morning, your honors. May it please the court, David on behalf of the government. Mr. Kennard is right. It was not involved in the proceedings below. And frankly, I think that's an advantage in this case. I think a dispassionate, careful review of the record reveals that along the lines of much of the court's questioning, that there was no repeated and massive misconduct by the government. The district court did not make a finding that was repeated of massive misconduct by the government. And it's not true that the evidence at issue all went to Austin's state of mind either. But what I'd really like to begin by focusing on is the questions of Chief Judge Smith and Judge Loken with respect to standard of review and the NAPU issue. The defense brought these issues a number of times before the district court, both at trial and after trial. And the posture on appeal is an appeal from the district court's denial of a rule 33 motion for a new trial. And as noted in the government's brief, the standard of review is clear. This court would have to find that the district court clearly abused its discretion in denying the motion for a new trial. And that would require a finding of manifest injustice. In the NAPU context, that requires a finding that there's a reasonable probability that the results of the proceeding would have been different, a reasonable likelihood. And in this case, I think it's important, as the court has already done, to focus on the nature of the testimony, the nature of the district court's finding, and the nature of the remedy. And as this court has noted, what the district court found was that the testimony at issue here was the result of either misrecollection, impossibility, or falsehood. And the district court made no finding as to which of those things was true. With respect to some of the testimony, Agent Kinney and Agent Snell, the district court concluded that what Bill Austin testified true was false, ordered the government to recall case agents, which it did. The case agents testified with respect to their recollection and their knowledge. The district court then advised the jury that Mr. Austin's testimony would be struck as false, which is what is required under NAPU, and further instructed the jury that they could draw adverse inferences against a key government witness with respect to the rest of his testimony, coupled with another instruction that told the jury that once a witness is found incredible as to one matter, they can be found incredible as to others. That remedy is not only sufficient, it's extraordinary, but it certainly comports with both the district court's findings with respect to the nature of the violation, and the NAPU doctrine, which is meant to ensure that if there's a finding of false testimony in the record, that that testimony is corrected. Now, what's the government's view with respect to the testimony of Agent Kinney and Agent Snell? That frankly, there isn't any showing of perjury whatsoever, and certainly the district court, although initially making a NAPU determination on perjury, it's clear from this record, after a motion for reconsideration from the government, argument on the record, and then a final jury instruction conference, that the district court ultimately concluded that the testimony was false, that it would not instruct the jury it was a defense, and would allow the government to argue that it was not a knowing falsehood, and allow the defense to argue it was. That's the state of the record with respect to Agent Kinney and Agent Snell's testimony. Now, furthermore, with respect to Agent Kinney, what Agent Kinney first testified to was consistent with a search warrant affidavit, where he wrote that Austin typically shredded dissenting gross reports. Austin states, I've never shredded a gross report in my life. Agent Kinney is recalled to the stand, and what he says is, in the October interview from which his search warrant affidavit statement was derived, Austin told him that a Starkey employee named Miller would give him the dissenting gross report and tell Austin to either destroy it or shred it, and Austin said, I didn't shred it. Kinney's testimony then, when recalled at the direction of the district court, was not that Austin had perjured himself, but rather that Austin had told him that Miller indicated he should either shred or destroy the report, and that he, Kinney, for purposes of the search warrant affidavit, assumed that Austin shredded it. And you can find that testimony, your honors, at trial transcript 11, I'm sorry, 5972 to 5983. Those are the page numbers, and particularly 5975 line 15 through 5976 line 4. That is the excerpt where Agent Kinney testifies after being recalled. Now, with respect to Agent Snell, and this is reflected in the jury instructions as to what the district court struck, Agent Snell testified that the contract amendment could not have been prepared in one day and was not prepared or drafted by Rosicka. Austin testified it was his belief that the contract amendment had been prepared in one day and that Rosicka had done it. And if you look at the jury instruction, the district court ultimately delivered, it said, I'm striking as false Austin's testimony that he believed that Rosicka drafted the contract and did so in one day. Snell said that wasn't possible. Now, it's certainly true that Austin, that Snell's testimony in the emails reflect it wasn't drafted in one day and it wasn't drafted solely by Rosicka. The district court corrected that, ordered the government to correct that testimony. It was corrected, and the district court so advised the jury. That, your honors, is I think a fair and dispassionate reading of the record in this case. The defendant in his reply brief indicates there's clearly a NIPU and perjury here. And if you'll note, the defendant only cites from the appendix pages 54 to 63. Well, that's the first NIPU order issued by the district court. It doesn't consider the government's motion for reconsideration. It doesn't consider the extensive arguments of the parties on that motion. It doesn't consider the district court's ruling on the record on the motion for reconsideration. It doesn't consider the district court's second NIPU order, and it doesn't consider the fact that at the close of trial, the defense specifically pressed the district court for a jury instruction reflecting a finding of perjury, and the district court refused to give it, saying he could not determine whether the testimony was perjurious or not. Counsel, this is Jed Smith. How did the district court characterize the testimony of Corpella in concluding whether it was perjurious or not? Yes, your honor, Chief Jed Smith. What the district court characterized Corpella's testimony as, as not having a good faith basis. As Mr. Conard indicated, the district court was not sparing in its criticism of Corpella's what he called evasiveness on the stand on cross-examination and lack of clarity on what was critical of Agent Corpella's testimony, and it asked your honors to consider that with respect to its approach to the issue of whether a new trial was required. You have a district court that carefully reviewed the record, made an assessment of the testimony, was critical of it, and nonetheless determined that no new trial was necessary because, Chief Jed Smith, your earlier question, there was no count of conviction in this case that related to this sound point valuation. It could only have arguably related to the conspiracy count on which Rezicka was convicted or the sound point tax count, I'm sorry, acquitted or the sound point tax count upon which Rezicka was acquitted. I apologize, your honor, if you can hear that. That's my home phone. Let me just mute this. I assume that was argued strongly to the jury in closing arguments, debated, maybe is a better word, that both counsel probably addressed the significance of Corpella's testimony to the various counts. Significance of her testimony and her credibility, your honor, was argued to the jury adversely. Which the trial court had adversely commented on to the jury. I don't think with respect to Agent Corpella, but certainly with respect to Bill Austin. Chief Jed Smith, with respect to that good faith basis determination by the district court, and this is outlined in the government's brief, there is absolutely support for Agent Corpella's was pegged to the amount of the accounts receivable. And this evidence is noted in the government's brief. If the court wanted to review the documents supporting that, one place the court could find it is exhibit 578, that's a government trial exhibit, as well as at district court docket number 697, exhibits two and three. And that's the post trial filing in connection with defendant's motions. And what those demonstrate, both in a letter of e-mails and documents related to Pat Dyckhoff, who was involved in the transaction, is that the purchase price was linked to the amount of the accounts receivable. And the entire cross examination, and I encourage the court if it hasn't to take another look at it, is focused on the fact that the sales price is expressed in units. But of course that says nothing as to how the units were valued. And Agent Corpella is clear in her testimony that she believed this was her opinion. There's no question that this is opinion testimony of Agent Corpella that had a good faith basis, that the sales price is related to the accounts receivable. So if that's responsive to your question, Chief Justice, I do think there was a good faith basis. I think it's reflected in the record and documented as such. And at the end of the day, the district court, notwithstanding its criticism of the testimony, correctly concluded, and again, the standard here is a clear abuse of discretion and a manifest injustice with respect to a new trial. And on that point, and there clearly was none with respect to this, it's approximately two pages, and it relates to something that doesn't have any bearing on the ultimate counts of conviction. Now, with respect to clear abuse of discretion in the new trial and that issue and all of these, and I think it goes to cumulative error, I would just like to emphasize the scope of what the district court had before it. This was a seven-week trial. There are 30 volumes of trial testimony. There are dozens of witnesses. Bill Austin was on the stand for four days. Scott Nelson was on the stand for three days. Brzezinska was convicted of four separate schemes. There are something like 1400 docket entries in this case. And as the court can tell, it was passionately and deeply litigated. The district court issued hundreds of pages of orders, including a 70-some page order with respect to the new trial motion. There is no question in the government's view that the district court gave careful consideration to all these claims, rejected them not once, not twice, but really three times. The third time being when Brzezinska moved for release pending appeal. And the district court determined there was no substantial issue here that would support release pending appeal. So with respect to a new trial and cumulative error, your honors, we are flyspecking really a few pages. Counsel, let me proceed to another type of flyspecking. I struggle with the sufficiency of the evidence on what's called the Northland fraud because these lengthy briefs never explain what was the restricted stock quote payoff, what was the basis for that payoff, and why did it constitute stealing from Starkey? Yes, your honor. So with respect to your first question, what was the payoff? And this is in the basis for the payoff. It could have been redistribution of subists, it could have been preliminary redemption of stock, in which case I assume Starkey would have been shown as the new majority holder, or it could have been dividends, or it could have been something else. But nobody tells me what it was. My understanding, your honor, is it was extinguishing of the restricted shares, that they sold their stock. Redemption? Yes, yes, your honor. So did the shareholder record show that Starkey then became the majority holder? Since the recipients of the payoffs only had 51 percent, it would have been quickly Starkey would have been the majority holder. Did the shareholder record show all that? Your honor, I confess I don't know the answer to that. Perhaps Mr. Kahn does. Where's the stealing? Yes, your honor. So what happened here with respect to the stealing is that Rizuka, Nelson, and Lontane cashed in these restricted shares without the knowledge of Austin, that is, as the CEO and other important parties in Starkey. And what they did here to conceal it, your honor, is clearly fraudulent. Wait a minute. A lot of things are are concealed from majority shareholders who aren't watching the books carefully. That doesn't make it fraudulent. The defenders say concealing. What was the stealing? Yeah, the stealing was taking this money through a series of fraudulent devices. They used phony valuations for the stock. I want to know what the restricted stock payoffs are described in the brief as establishing the Northland fraud because it was stealing from Starkey. And I don't understand, and you're not telling me, you're not clarifying why those payoffs constituted stealing. They stole from Starkey because they used, one, phony valuations for the stock. Two, they used dishonest accounting to hide the transaction. Three, they altered documents so that Austin wouldn't find out about it because they knew he wouldn't allow it. Four, they used what they characterized as CYA loan documents, cover your ass loan documents, to paper over the fraud. And five, Rizuka expressed his plan to defraud Austin, which was if he ever finds out about it, I'll try to trade the money we're taking off of my employment agreement. That is how they stole from Starkey. They valued the stock first at $12.9 million, but when they discovered that that wasn't enough for what they wanted from the shares, they arbitrarily increased it to $15 million, working backwards from what they wanted their payoff to be. That's theft when you lie about what the stock is worth. Then they booked it on Northland's books rather than Starkey's because they didn't want it on the descending gross report to conceal it from the company. That's theft. Then they altered documents because when Nelson was concerned that the transaction would nonetheless appear on the Northland descending gross reports, Rizuka told them to delete it from the reports before they provided it to Austin. Wait a minute, Council. Why would a Northland stock redemption have to be shown on Northland? What the testimony at trial was is that Karen Hines and others indicated that the transaction was most favorable in terms of its tax treatment to Starkey if it was booked through Starkey. What do you mean booked through Starkey? Starkey was a 49% owner of Northland. Northland is redeeming some of the majority shareholder's stock and it's being recorded on Northland's books. I don't see any stealing there. The payoff, Your Honor, was the best way to book the payoff made on the restricted stock. They made a financial mistake. So what? That's not fraud. No, the evidence was it was fraud, respectfully, Your Honor. It wasn't a mistake. You can't explain it to me. I keep asking and I don't understand the stealing. They lied. It's not stealing. It's bad business. It's not fraud. They lied and made material misrepresentations in at least five different respects. Okay, well, you can prosecute them for that. Well, respectfully, that's what we did, Your Honor. Lying does not equal fraud. Making misstatements to the government can be a different crime. They may. Well, lying, cheating, and stealing when it is endeavored by false misrepresentations and active concealment absolutely is fraud. And that's what happened in this case. False misrepresentations. Not unless there's a victim. Counselor, you're just making classic prosecutor overstatements in the white counter field. Well, let's go on. There's too many issues here. You've satisfied me that this one is troubling for me. Well, I mean, okay, I would conclude on that point by saying that the evidence of fraud that these defendants worked to defraud Starkey, that is to collect these payoffs on a phony valuation and hide them, was overwhelming at trial. And the district court agreed repeatedly with respect to the strength of the evidence. I only have a minute left, Your Honors. Unless there's an issue that any of you have a concern about? I'd be curious as to what the government's position is with respect to this motion for a limited remand. Your Honor, I certainly defer to the court as to how it wants to administer the timeline here. The government certainly does not believe the motion for compassionate release bears as a matter of substance on the issues on appeal. In other words, it's not that the court resolved in that one way or another. Government's estimation would influence how you dispose of the issues currently before it. Is there something specific, Your Honor? Well, the motion represents that there's been some sort of an indicative ruling by the district court. Is that correct? Does the government support this limited remand or not? There has been indicative ruling. The government maintains its opposition to the motion for compassionate release. If by limited remand, there's an effort to allow the under advisement these issues and decides them, the government doesn't have an opposition to that given that those issues don't bear on this appeal. But I think in keeping with Chief Judge Smith's comments at the beginning, the government does have an interest in having this appeal submitted and decided given the stage of the proceedings at the moment and how far they can go. Opinion or authority on the question of if we remand and order a new trial, what impact that has on the compassionate release motion? Well, I guess if you remand for a new trial, Your Honor, the district court would be faced with two issues perhaps. I mean, the district court would then have to decide whether to free Mr. Ruzicka on a pretrial basis with respect to the new trial, I think would be the first order of business. And I think then, Your Honor, I don't have any cases, but I think then the compassionate release issues would essentially be subsumed under pretrial release. In other words, our courts are considering the conditions in jails with respect to whether to hold someone pretrial. That sounds logical to me. Thank you. Okay. Unless the court had any further inquiry, then the government would rest on the briefs. Thank you for the opportunity to argue this morning. Thank you, Mr. Kenridge. Mr. Kenridge, I think you had about 30 seconds, but we'll give you a full minute to complete your rebuttal. You're muted. Your Honor, I had five minutes reserved plus the 30 seconds. Unfortunately, that five minutes was consumed. Oh, okay. So speaking directly to sufficiency, Your Honor, Mr. Kenridge is simply wrong. The valuation was not phony. They never said it was phony. It's government exhibit 657. It was admitted by them on direct examination through their cooperating witness, who later went on to testify that the stock was redeemed early at a discount that was favorable to Starkey. The valuation was not done by any of the defendants, but rather an for 20 years, all of which the government is aware. And if Your Honors would look at exhibit Rosicka 58, it's an email from the auditors that specifically says it's McGladrey and Poland that required the deal to be done on Northland's books, not Rosicka and not Nelson. The auditors actually told them the opposite. So the government's sort of promoting a narrative that is simply untrue. The undisputed weight of the evidence here is that, in the government's own evidence, is that by redeeming the stock early, they save Starkey a ton of money. And if you look at the stock documents, even if these guys had been terminated for cause, they would have been entitled to 70% of the interest of the stock based on the shareholder control agreement as the guy who drafted them agreed. So there is no theft on that. We argue that both in our brief and then if you look at our arguments in the restitution calculation section, we more overtly draw out the valuation question. At the end of the day, the redemption benefited Starkey and was undertaken for that basis based on the testimony of Scott Nelson. I'm happy to keep talking. I want to continue, but we have other cases to get to this morning. All right. Thank you. Have a great weekend, Your Honors. Thank you. Thank you, Mr. Kennard. Thank you also, Mr. Genry. We appreciate both counsel's participation and argument this morning, and we'll continue wrestling with the briefing that's been submitted and rendered decision in due course. Thank you, Your Honor.